**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | |
| **JERRY MCKANE WAYNICK** | **Case No. 1:23-cr-175 (TJK)** |
| **and** | |
| **MARK WAYNICK** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Jerry McKane Waynick to 109 months of incarceration, 36 months of supervised release, restitution in the amount of $2000, a special assessment of $100 for each felony conviction, and $25 for each Class A misdemeanor. As to Mark Waynick, the government requests that this Court sentence him to 88 months of incarceration, 36 months of supervised release, restitution in the amount of $2000, and a special assessment of $100 for each felony conviction, and $25 for each Class A misdemeanor. These recommendations reflect the midpoint of each defendant's sentencing range as calculated by the government.

## I.     INTRODUCTION

If adopted by this Court, the government's sentencing recommendations would be sufficient but not greater than necessary to account for the Waynicks' protracted, violent participation in the riot.

1

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts filed in this case (*see* ECF 1-1 at 1) for a short summary of the January 6, 2021 attack on the U.S. Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     The Waynicks' Role in the January 6, 2021 Attack on the Capitol

#### *Approach to the Capitol*

McKane is Mark's son.   Their crimes on January 6 were memorialized on Body Worn Camera ("BWC") footage from the Metropolitan Police Department ("MPD"), open-source video and photos, video from other January 6 defendants, and video surveillance footage from inside the U.S. Capitol.

On January 6, 2021, the Waynicks attended the "Stop the Steal" rally, which took place on the Ellipse in front of the White House. After the rally, they walked to the U.S. Capitol Building wearing helmets, tactical vests, gloves, and goggles. They entered the closed U.S. Capitol grounds shortly after the initial breach of the Peace Circle at 12:55 p.m., and went to the West Front of the U.S. Capitol on the North side, where a line of MPD and United States Capitol Police ("USCP") officers were attempting to prevent rioters from breaching the U.S. Capitol. There, the Waynicks joined other rioters' efforts to push against a line of police officers just before 1:36 p.m.



*Image 1: Screenshot from Government's Trial Exhibit 306A at 51 seconds. Mark Waynick is circled in yellow. McKane Waynick is circled in red.*

Also at that time, McKane saw that police officers were trying to detain another rioter who was wearing a red hat, dreadlocks, and a camouflage backpack. McKane rushed the barricade to grab that rioter and pull him away from the officers, interfering with the detention. While grabbing the other rioter, McKane swiped at an officer's riot baton. When he was unsuccessful in grabbing

the baton, he retreated into the crowd.



*Image 2: Screenshot from Government's Trial Exhibit 212A at 20 seconds showing McKane Waynick grabbing at a police baton while interfering with the detention of another rioter.*

At the same time that McKane reached for the baton, 1:36 p.m., Mark swung his American flag that was attached to a metal pole with a metal finial into the line of police officers. Before the pole hit any officers, Officer M.V. intercepted the pole by grabbing it from Mark and threw it over

his head behind the line of police officers.



*Image 3: Government's Trial Exhibit 302 where Mark Waynick is circled in yellow, swinging his metal flagpole into a line of police officers.*

Minutes later, at 1:39 p.m., McKane returned to the metal barricades and joined with at least four other rioters to separate one metal bicycle rack from the others and pull it into the crowd to create an opening in the barricade while Officer E.S. and at least two other officers hung on to it. The dogged officers prevented the rioters from taking full possession of the separated bicycle

rack.



*Image 4: Government's Trial Exhibit 307 showing McKane circled in red, joining with other rioters to pull the metal barricade away.*

Less than one minute later at 1:40 p.m., McKane moved stealthily in front of a line of police officers and stared at the officers.   A female rioter nearby kicked a large plastic construction marker toward McKane who waited with his arms outstretched to receive it. McKane caught the marker, turned his body 180 degrees, adjusted his grip on the marker, aimed the marker toward the line of officers, and hurled it with both hands at the officers, striking Officer M.V. and Officer T.T. This marker weighed approximately ten pounds and was three feet tall. Both officers kept an eye on McKane, and seeing the construction marker launched toward them, were able to deflect it with their outstretched hands. Had they not been on their guard, they could easily have had more serious injuries given the weight and size of the marker. McKane then ran back into the crowd.



*Image 5: Screenshot from Government's Trial Exhibit 218A at 1:33 showing McKane Waynick circled in red aiming the construction marker toward a line of police officers.*

### Entry into the U.S. Capitol

The Waynicks attempted unsuccessfully to go up the Northwest staircase, but were pushed back down with OC Spray. While washing his eyes out, McKane stated, "fuck the police." The Waynicks pushed up the stairs to the Upper West Terrace and entered the U.S. Capitol Building from the Senate Wing Door at 2:20 p.m., just minutes after the initial breach at 2:13 p.m. They moved throughout the building for approximately 35 minutes.

The Waynicks entered the Will Rogers Hallway, which was outside the House Chamber, where terrified Members of Congress and staffers were sheltering in place, at around 2:28 p.m. They joined the mob of rioters who pushed past the handful of officers guarding that hallway. The mob repeatedly tried to talk their way past officers. Although the Waynicks did not touch any officers, other members of that contingent of rioters pushed officers out of the way. At approximately 2:35 p.m., the mob pushed officers back, through two sets of doors, to the House Chamber Main Door.   The Waynicks then followed the advancing rioters and moved to within a

few feet of the House Chamber.   The mob chanted, "break it down!" repeatedly while outside of the House Chamber. An individual recording video captured the scene afterward and asked McKane about what he had seen. McKane replied that he saw "guns" and said, "we're an imminent threat to the people inside." The Waynicks followed the mob down a hallway close to the Speaker's Lobby, where at 2:44 p.m., a rioter who jumped through a smashed-out pane was shot by an officer. The Waynicks exited the Capitol building at 2:55 p.m. from the Upper House Door.

### III.   THE CHARGES

On February 28, 2024, a federal grand jury returned a second superseding indictment charging Jerry McKane Waynick and Mark Waynick with fourteen counts:

- Count One, Interfering with Law Enforcement Officers During a Civil Disorder, 18 U.S.C. §231(a)(3);

- Count Two, Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1), based on McKane attempting to grab an officer's baton;

- Count Three, Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1) and (b), based on McKane throwing a construction marker at Officer M.V.;

- Count Four, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1), based on McKane grabbing and pulling a metal barricade while Officer E.S. held on to it;

- Count Five, Assaulting Resisting, or Impeding Certain Officers Using a Dangerous Weapon 18 U.S.C. § 111(a)(1) and (b), based on Mark swinging his flagpole into a line of officers;

- Count Six, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A) where the Dangerous Weapon is the construction marker;

- Count Seven, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A), where the Dangerous Weapon is the metal flagpole;

- Count Eight, Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. §1752(a)(2) and (b)(1)(A), where the dangerous weapon is the construction marker;

- Count Nine, Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A), where the Dangerous Weapon is the metal flagpole;

- Count Ten, Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(1)(4) and (b)(1)(A), where the dangerous weapon is the construction marker;

- Count Eleven, Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(1)(4) and (b)(1)(A), where the dangerous weapon is the metal flagpole;

- Count Twelve, Disorderly Conduct in a Capitol Building, 40 U.S.C. § 5104(e)(2)(D);

- Count Thirteen, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F); and

9

- Count Fourteen, Parading Demonstrating, and Picketing in the United States Capitol Building, 40 U.S.C. § 5104(e)(2)(G).

On April 17, 2024, following a bench trial, this Court convicted McKane of Counts One, Two, Three, Four, Six, Eight, Ten, Twelve, Thirteen and Fourteen, and convicted Mark of counts One, Five, Seven, Nine, Eleven, Twelve, Thirteen and Fourteen.

## IV.    STATUTORY PENALTIES

The Waynicks now face sentencing on each count of conviction. The maximum custodial sentences and fines are set forth on pages 1 and 2 of each defendant's PSR.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Probation Office calculated a total offense level of 28 for McKane, ECF 87, ¶¶ 42-97, and a total offense level of 24 for Mark, ECF 88, ¶¶ 39-79. The government disagrees with those calculations.

**Government's Guidelines Analysis for McKane Waynick**

Unlike the Probation Office, the government recommends that the Court to apply a two-level enhancement for More than Minimal Planning, pursuant to U.S.S.G. § 2A2.2(b)(1) for Groups One, Two, Three and Four of McKane's convictions, because he wore a helmet, a tactical vest, gloves, and goggles when he attacked the Capitol building during the riot.   *See, e.g. United States v. Alberts*, D.D.C. 21-cr-26 (CRC); *United States v. Denney,* D.D.C. 22-cr-70 (RDM) (applying the two-level enhancement for More than Minimal Planning).

The Government also recommends that the Court apply a four-level enhancement, pursuant to U.S.S.G. § 2A2.2(b)(2), for use of a dangerous weapon, to Counts Six and Eight, which involve McKane throwing the construction marker.

The Government agrees with the PSR's grouping analysis: Group One: Counts One and Two; Group Two: Counts Three and Ten; Group Three: Count Four; Group Four: Counts Six, and Eight.

The government's Sentencing Guidelines calculations are as follows:

Count One: Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. §231(a)(3)

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Cross Reference | | Section 2A2.4(c) directs that Section 2A2.2 applies "if the conduct constituted aggravated assault." |
| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) (Aggravated Assault) |
| Specific Offense Characteristic – Dangerous Weapon Used | +4 | U.S.S.G. § 2A2.2(b)(2) |
| Adjustment – Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b) or alternatively, U.S.S.G. § 3A1.2(c)(1) |
| Special offense characteristic – More than Minimal Planning | +2 | U.S.S.G. § 2A2.2(b)(1) |
| Total | 26 | |

Count Two: Assaulting, Resisting or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) which correlates to McKane swiping at an officer's baton

| Base offense level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Cross Reference | | Pursuant to U.S.S.G. §2A2.4(a) (Obstructing Officers), the Base Offense Level is 10. But § 2A2.4(c) directs that a cross-reference to § 2A2.2 applies "if the conduct constituted aggravated assault." |
| Base offense level | 14 | U.S.S.G. §2A2.2(a) |
| Special offense characteristic | +2 | U.S.S.G. § 2A2.2(b)(1) |

| – more than minimal planning | | |
|---|---|---|
| Victim-related adjustment – Official Victim | +6 | U.S.S.G. §3A1.2(b) |
| Total | 22 | |

Count Three: Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon, 18 U.S.C. § 111(a)(1) and (b) which correlates to McKane throwing a construction marker at Officer M.V.

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Cross reference | | Pursuant to U.S.S.G. § 2A2.4, the Base Offense Level is 10. But § 2A2.4(c) directs that a cross-reference to § 2A2.2 applies "if the conduct constituted aggravated assault." |
| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) (Aggravated Assault) |
| Specific Offense Characteristic – Dangerous Weapon Used | +4 | U.S.S.G. § 2A2.2(b)(2) |
| Specific Offense Characteristic – Convicted under 18 U.S.C. § 111(b)." | +2 | U.S.S.G. § 2A2.2(b)(7) |
| Adjustment – Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b) |
| Special offense characteristic – More than Minimal Planning | +2 | U.S.S.G. § 2A2.2(b)(1) |
| Total | 28 | |

Count Four: Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1), which correlates to McKane pulling a metal barricade while Officer E.S. held on to it

| Base Offense Level | 10 | U.S.S.G. § 2A2.4 |
|---|---|---|
| Cross Reference: | | Pursuant to U.S.S.G. § 2A2.4, the Base Offense Level is 10. But § 2A2.4(c) directs that a cross-reference to § 2A2.2 applies "if the conduct constituted aggravated assault." |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Adjustment | +6 | U.S.S.G. § 3A1.2(a), (b) |
| Special offense characteristic – More than Minimal Planning | +2 | U.S.S.G. § 2A2.2(b)(1) |
| Total | 22 | |

Count Six: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A) where the Dangerous Weapon is the construction marker

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|
| Specific Offense Characteristic - Trespass at any restricted building or grounds. | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii): "the trespass occurred at any restricted building or grounds." |
| Specific Offense Characteristic – Dangerous Weapon | +2 | U.S.S.G. § 2B2.3(b)(2) |
| Cross-reference | | U.S.S.G. § 2B2.3(c)(1) |
| Base Offense Level (adjusted) | 14 | U.S.S.G. § 2X1.1(a) |
| Specific Offense Characteristic – dangerous weapon | +4 | U.S.S.G. § 2A2.2(b)(2) |
| Special offense characteristic – More than Minimal Planning | +2 | U.S.S.G. § 2A2.2(b)(1) |
| Total | 20 | |

Count Eight: Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. §1752(a)(2) and (b)(1)(A), where the dangerous weapon is the construction marker

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Special offense characteristic – Physical Contact | | U.S.S.G. § 2A2.4(b)(1)(A) |
| Cross reference | | Pursuant to U.S.S.G. § 2A2.4, the Base Offense Level is 10. But § 2A2.4(c) directs that a cross-reference to § 2A2.2 applies "if the conduct constituted aggravated assault." |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Specific Offense Characteristic – Dangerous Weapon Used | +4 | U.S.S.G. § 2A2.2(b)(2) |
| Special offense characteristic – More than Minimal Planning | +2 | U.S.S.G. § 2A2.2(b)(1) |

13

| Total | 20 | |
|-------|----|--|

Count Ten: Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(1)(4) and (b)(1)(A), where the dangerous weapon is the construction marker

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|--------------------|----|--------------------|
| Special offense characteristic – Physical Contact | | U.S.S.G. § 2A2.4(b)(1)(A) |
| Cross reference | | Pursuant to U.S.S.G. § 2A2.4, the Base Offense Level is 10. But § 2A2.4(c) directs that a cross-reference to § 2A2.2 applies "if the conduct constituted aggravated assault." |
| Base Offense Level: | 14 | U.S.S.G. § 2A2.2(a) |
| Specific Offense Characteristic – Dangerous Weapon Used | +4 | U.S.S.G. § 2A2.2(b)(2) |
| Special offense characteristic – More than Minimal Planning | +2 | U.S.S.G. § 2A2.2(b)(1) |
| Total | 20 | |

**Government's Guidelines Calculation for Mark**

The government again recommends that the Court apply the two-level enhancement for More than Minimal Planning, pursuant to U.S.S.G. § 2A2.2(b)(1) for all counts because he, like his father, wore a helmet, a tactical vest, gloves, and goggles when he attacked the Capitol building during the riot.  For Count Five, two levels should be added because Mark was convicted for violating 18 U.S.C. § 111(b). On Counts Seven and Nine, four levels should be added for use of a dangerous weapon, the flagpole.

The Government agrees with the PSR's grouping analysis: Group One: Counts One, Five, and Eleven; and Group Two: Counts Seven and Nine.

Count One: Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. §231(a)(3)

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Cross Reference | | Section 2A2.4(c) directs that Section 2A2.2 applies "if the conduct constituted aggravated assault." |
| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) (Aggravated Assault) |
| Specific Offense Characteristic – Dangerous Weapon Used | +4 | U.S.S.G. § 2A2.2(b)(2) |
| Adjustment – Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b) |
| Special offense characteristic – More than Minimal Planning | +2 | U.S.S.G. § 2A2.2(b)(1) |
| Total | 26 | |

Count Five: Assaulting Resisting, or Impeding Certain Officers Using a Dangerous Weapon 18 U.S.C. § 111(a)(1) and (b)

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Cross reference | | Pursuant to U.S.S.G. § 2A2.4, the Base Offense Level is 10. But § 2A2.4(c) directs that a cross-reference to § 2A2.2 applies "if the conduct constituted aggravated assault." |
| Base Offense Level | 14 | U.S.S.G. §2A2.2(a) (Aggravated Assault) |
| Specific Offense Characteristic – Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2) |
| Specific Offense Characteristic - the defendant was convicted under 18 U.S.C. § 111(b). | +2 | U.S.S.G. § 2A2.2(b)(7) |
| Adjustment – Official Victim | +6 | U.S.S.G. § 3A1.2(a), (b) |
| Special offense characteristic – More than Minimal Planning | +2 | U.S.S.G. § 2A2.2(b)(1) |
| Total | 28 | |

Count Seven: Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, 18 U.S.C. § 1752(a)(1) and (b)(1)(A), where the Dangerous Weapon is the metal flagpole

| Base Offense Level: | 4 | U.S.S.G. § 2B2.3(a) |
|---|---|---|

15

| Specific Offense Characteristic - the trespass occurred at any restricted building or grounds | +2 | U.S.S.G. § 2B2.3(b)(1)(A)(vii) |
|---|---|---|
| Specific Offense Characteristic – Dangerous weapon | +2 | U.S.S.G. § 2B2.3(b)(2) |
| Cross-reference | | U.S.S.G. § 2B2.3(c)(1) |
| Base Offense Level (adjusted) | 14 | U.S.S.G. § 2X1.1(a) |
| Specific Offense Characteristic – Dangerous weapon | +4 | U.S.S.G. § 2A2.2(b)(2) |
| Special offense characteristic – More than Minimal Planning | +2 | U.S.S.G. § 2A2.2(b)(1) |
| Total | 20 | |

Count Nine and Eleven: Disorderly or Disruptive Conduct in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(2) and (b)(1)(A), where the Dangerous Weapon is the metal flagpole and Engaging in Physical Violence in a Restricted Building or Grounds with a Dangerous Weapon, 18 U.S.C. § 1752(a)(1)(4) and (b)(1)(A), where the dangerous weapon is a metal flagpole.

| Base Offense Level | 10 | U.S.S.G. § 2A2.4(a) |
|---|---|---|
| Special offense characteristic – Physical Contact | | U.S.S.G. § 2A2.4(b)(1)(A) |
| Cross reference | | Pursuant to U.S.S.G. § 2A2.4, the Base Offense Level is 10. But § 2A2.4(c) directs that a cross-reference to § 2A2.2 applies "if the conduct constituted aggravated assault." |
| Base Offense Level | 14 | U.S.S.G. § 2A2.2(a) |
| Specific Offense Characteristic – Dangerous Weapon | +4 | U.S.S.G. § 2A2.2(b)(2) |
| Special offense | +2 | U.S.S.G. § 2A2.2(b)(1) |

| characteristic – More than Minimal Planning | | |
|---|---|---|
| Total | 20 | |

Section 4C1.1 does not apply for either McKane or Mark because they were both convicted of violent offenses, particularly aggravated assault in violation of 18 U.S.C. § 111(b).

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, the Waynicks' felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. The nature and circumstances of the Waynicks' offenses were of the utmost seriousness, and fully support the government's recommended sentences.

### B.  The Waynicks' History and Characteristics

Jerry McKane Waynick only has a juvenile record. PSR ¶¶ 98-99. He stated that when he was 16 years old, he was charged with possession of alcohol for which he received an informal adjustment.   The Tennessee Administrative Office of the Courts, Rule 201 states that if the designated court officer determines that the matter is not serious enough to require official action before the juvenile court judge, the designated court officer may remedy the situation by giving counsel and advice to the parties through an informal adjustment. ¶ 98. Therefore McKane's

17

criminal history score is zero, establishing a criminal history category of I. ¶ 100.

Mark Waynick does not have any criminal history; thus, his criminal history score is zero., establishing a criminal history category of I.

**C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. The Waynicks' criminal conduct on January 6 was the epitome of disrespect for the law.

**D.    The Need for the Sentence to Afford Adequate Deterrence**

*General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[1] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to the Waynicks also weighs heavily in favor of a lengthy term of incarceration.

To date, neither Waynick has expressed remorse for his criminal acts on January 6. McKane has not even accepted the reality of what happened on that day. McKane told the Probation Officer that "he entered the US Capitol because protestors told him that the police were

_____

[1] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

allowing people to enter the building. Mr. Waynick stated he walked by police as he entered the building, and no officer told him to leave." PSR ¶ 38.

That statement contradicts the reality that there were multiple signs that he should not have been there. He tried to grab a police baton while officers were trying to detain a rioter.   He pulled away a metal barricade meant to protect police officers and the U.S. Capitol from the advancing mob. He threw a construction marker at police officers guarding the U.S. Capitol. He tried to advance up the Northwest staircase, but was pushed back down with OC Spray, to the point where he stood washing his eyes out. He knew it was police officers who pushed him out because he stated, "fuck the police," while washing his eyes out.

He then entered the U.S. Capitol Building at 2:20 p.m., just seven minutes after the first breach of that door at 2:13 p.m., and likely witnessed that initial breach. Once inside of the U.S. Capitol, he was part of the mob advancing on the House Chamber as police tried to keep the group pushed back and several rioters tried to negotiate with police. When a person filming the riot interviewed McKane, he referenced seeing guns, and noted "we're an imminent threat to the people inside." Just one of these facts – let alone the collective – should have been enough to signal to McKane that an unknown rioter was wrong about being able to enter the U.S. Capitol. His decision to continue to believe entry was lawful shows his complete denial of the facts presented against him throughout two days of trial. McKane's sentence must be sufficient to provide specific deterrence from committing future crimes.

Mark has not made any statements with respect to his reasons for his actions on January 6, 2021.

### E.      The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.      Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18

U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[2] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[3]

---

[2] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

[3] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL

While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

*Comparators for Jerry McKane Waynick*

In *United States v. Quaglin,* 21-cr-40 (TNM), Judge McFadden convicted the defendant following a stipulated trial of three counts of violating 18 U.S.C. § 111(a)(1), two counts of violating U.S.C. § 111(b), two counts of violating 18 U.S.C. § 2111, and one count each of violating 18 U.S.C. § 1512(c)(2), 231(a)(3), 18 U.S.C. §§ 1752(a)(1) and (a)(4) and (b)(1)(A) and 40 U.S.C. § 5104(e)(2)(F) and (e)(2)(G). Judge McFadden sentenced Quaglin to 144 months of incarceration and two years of supervised release. Like McKane, Quaglin aimed to commandeer equipment police used to protect themselves. Quaglin tore a riot shield away from a police officer and pulled away a metal barricade, whereas McKane attempted to take a baton away from an officer and pulled away a metal barricade. Both had additional violent conduct: Quaglin used OC spray against officers, whereas McKane threw a construction marker at them. Both prepared for violence by wearing tactical gear. Quaglin had one more incident of violent conduct, encouraged others to join, and boasted and bragged about his conduct. Although Quaglin's sentence of 144 months is higher than the government's recommendation of 109 months for McKane, Quaglin's higher sentence can be attributed Quaglin's convictions of 18 U.S.C. § 2111 and 18 U.S.C. § 1512(c)(2), which McKane did not have.   Where McKane did not have these additional convictions, but had otherwise similar conduct, McKane should receive a sentence of 109 months.

---

BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

In *United States v. Roe,* 23-cr-277 (CKK), Roe pleaded guilty to three counts of violating 18 U.S.C. 111(a)(1). Judge Kollar-Kotelly sentenced Roe to 70 months of incarceration and 24 months of supervised release. Like McKane, Roe forcefully tried to remove a metal barricade, which protected outnumbered police officers from the violence of rioters. Both Roe and McKane also had additional assaultive conduct where Roe assaulted a police officer while also brandishing a pitchfork. Roe also assaulted an officer by trying to push the officer, shoving his shoulder into the officer, and attempting to grab his riot baton. Roe also took a bicycle rack and slammed it against the doors of the Capitol building. McKane's additional conduct included trying to grab at a police officer's baton and throwing a construction marker at a line of police officers. Judge Kollar-Kotelly's sentence of 70 months' imprisonment was near the top of Roe's Guidelines range of 57 to 71 months. Here, the government's recommendation of 109 months is higher than Roe's sentence of 70 months; however, McKane does not get a three point reduction for acceptance of responsibility, and McKane received additional points for being convicted of using a dangerous weapon, the construction marker, which can account for the difference in these sentences.

*Comparators for Mark Waynick*

In *United States v. Webster,* 21-cr-208 (APM), a jury convicted the defendant of violating 18 U.S.C. §§ 111(a)(1) and (b), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(3), 18 U.S.C. § 1752(a)(1 and 4) and (b)(1)(A); and 40 U.S.C. § 5104(e)(2)(F). Judge Mehta sentenced Webster to 120 months of incarceration and 36 months of supervised release. Like Mark, Webster wielded his flagpole as a weapon. Webster chopped it down repeatedly on a metal barricade in front of where an officer was standing and where his hands were positioned. Webster struck the barricade with enough force to break the metal flagpole. Webster had other assaultive conduct toward police

officers, wore body armor, and made statements that expressed a lack of remorse. Webster's total offense level was 37, which is higher than Mark's total offense level, but Judge Mehta stated that he varied from the guidelines "to avoid unwarranted disparities, and also in acknowledgment of Mr. Webster's 25 years of service" and "credit for accepting responsibility, albeit belatedly." *United States v. Webster,* 21-cr-208 (APM), Tr. 9/1/22 at 66. The government's recommendation of 88 months for Mark is lower than the sentence that Webster received for similar conduct of using a flagpole as a dangerous weapon, but Webster's additional conduct, body armor, and statements account for the higher sentence that he received.

In *United States v. Smith,* 21-cr-599 (RBW), a jury convicted the defendant of violating 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 111(a) and (b), 18 U.S.C. § 231(a)(3), 18 U.S.C. §§ 1752(a)(1, 2, and 4) and (b)(1)(A), and 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(F). Smith had a total offense level of 30, and accordingly, Judge Walton sentenced Smith to 108 months of incarceration, 36 months of supervised release and a $37,085 fine. Like Mark, Smith used his flagpole as a weapon. He used it to break a window in the Tunnel, and threw a metal pole that struck a police officer in the head. Smith had additional assaultive conduct including kicking a police officer and statements. Although Smith's sentence is higher than the government's recommended sentence of 88 months for Mark, their use of a flag as a dangerous weapon is similar, and the higher sentence for Smith accounts for Smith's additional assaultive conduct.

In *United States v. Padilla,* 21-cr-214 (JDB), Judge Bates, following a bench trial, convicted Padilla of violating 18 U.S.C. § 111(a), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 111(a) and (b), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1512(c)(2), 18 U.S.C. §§ 1752(a)(1), (a)(2), (a)(4) and (b)(1)(A), and 40 U.S.C. § 5104(e)(2)(D) and (e)(2)(F). Judge Bates sentencing Padilla to 78

months of incarceration and 24 months of supervised release. Like Mark, Padilla used a flagpole as a weapon: he threw it at the head of a police officer. Like Mark, Padilla also brought items to protect himself against riot control measures. Mark brought a helmet, vest, gloves, and goggles, and Padilla brought goggles and a mask.   Padilla's total offense level was 33, which is higher than Mark's total offense level of 28. Unlike Mark, Padilla "was raised in a dysfunctional family" and "experienced a fair amount of trauma," which Judge Bates considered. *United States v. Padilla*, 21-cr-214 (JDB), Tr. 9/13/23 at 71.   Judge Bates also gave Padilla "a little bit of credit for seemingly starting to see the error of [his] ways." *Id.* at 72. The government's recommendation of 88 months of incarceration for Mark is higher than the sentence that Padilla received for similar conduct of using a flagpole as a dangerous weapon, but Judge Bates considered Padilla's difficult upbringing as a factor in his sentence, as well as Padilla's expression of remorse.   Neither of those factors apply in Mark's case.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110

Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Because the Waynicks were convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full

restitution without respect to a defendant's ability to pay.[4]

Because the Waynicks case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and [his or her] criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the Waynicks responsible for their individual contributions to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require the Waynicks to each pay $2,000 in restitution for their convictions on Counts One through Eleven and Thirteen. This amount fairly reflects the Waynicks' role in the offense and the damages resulting from his conduct. Moreover, in cases

---

[4] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

*Jerry McKane Waynick:*

McKane's convictions subject him to a statutory maximum fine of $250,000.   *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, McKane's financial assets set forth in the PSR suggest that he is unable, and is unlikely to become able, to pay a fine.

*Mark Waynick*

Mark's convictions also subject him to a statutory maximum fine of $250,000.

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e).

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of Jerry McKane Waynick to 109 months of incarceration, 36 months of supervised release, restitution in the amount of $2000, and a special assessment of $100 for each felony conviction, and $25 for each Class A misdemeanor. As to Mark Waynick, the government requests that this Court sentence him to 88 months of incarceration, 36 months of supervised release, restitution in the amount of $2000, and a special assessment of $100 for each felony conviction, and $25 for each Class A misdemeanor.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY


BY:    */s/ Aliya Khalidi*
ALIYA KHALIDI
Assistant United States Attorney
MA Bar Number 682400
U.S. Attorney's Office for the District of Columbia
601 D Street, NW Washington, D.C. 20001
(202) 252-2410
Aliya.khalidi@usdoj.gov

*/s/ Kyle M. McWaters*
Kyle M. McWaters
D.C. Bar No. 241625
Assistant United States Attorney
601 D Street NW
Washington, DC 20850
(202) 252-6983
kyle.mcwaters@usdoj.gov